**Andrea C. DOW, Plaintiff,**

v.

**George E. DONOVAN, et al., As partners of Lyne, Woodworth and Evarts, LLP, Defendants.**

**No. CIV. A. 00–11655–REK.**

United States District Court,
D. Massachusetts.

June 19, 2001.

252

Jody L. Newman, Dwyer & Collora, Jill R. Gaulding, Dwyer & Collora, LLP, Boston, MA, for Andrea C. Dow, Plaintiffs.

Thomas C. Cameron, Milton, Kenneth A. Johnson, Burns & Levinson, Boston, MA,

for George E. Donovan, as partner of Lyne, Woodworth and Evarts, LLP, Joseph F. Ryan, Edward P. McPartlin, Walter J. Connelly, Norman M. Goldberg, Frances X. Hogan, Edward S. Rooney, Norman C. Sabbey, John P. Carr, Kenneth A. Johnson, Domenic P. Aiello, Joseph H. Skerry, III, Stephen T. Kunian, Joshua J. Vernaglia, Michael J. Owens, Defendants.

## Opinion

KEETON, District Judge.

### I. Pending Matters

Bearing on matters pending for decision are the following filings:

(1) Defendant's Motion for Summary Judgment (Docket No. 24, filed November 6, 2000), with Statement of Material Facts as to Which There Is No Genuine Issue (Docket No. 25, filed November 6, 2000), Memorandum in Support (Docket No. 26, filed November 6, 2000) and Affidavit of Joseph F. Ryan with Exhibits 1–23 (Docket No. 27, filed November 6, 2000).

(2) Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Docket No. 30, filed December 5, 2000) with Statement of Material Facts of Record as to Which There Exist a Genuine Issue to Be Tried (Docket No. 29, filed December 5, 2000) and Affidavit of Jody L. Newman with Exhibits 1–18 (Docket No. 31, filed December 5, 2000).

(3) Defendants' Memorandum in Response to Court's Questions Concerning Limited Liability Partnerships (Docket No. 38, filed March 26, 2001).

(4) Plaintiff's First Amended Complaint for Trial by Jury (Docket No. 40, filed April 10, 2001).

(5) Plaintiff's Response to Defendants' Memorandum in Response to the Court's Questions Concerning Limited Liability Partnerships (Docket No. 41, filed April 10, 2001).

(6) Memorandum Summarizing Defendant's Positions (Docket No. 46, filed April 26, 2001).

(7) Plaintiff's Supplemental Memorandum on Partnership Liability for Discriminatory Decisions and Personal Liability of LLP Partners for Partnership Wrongs (Docket No. 47, filed April 26, 2001).

(8) Plaintiff's Response to Memorandum Summarizing Defendant's Positions (Docket No. 48, filed May 16, 2001).

(9) Response Memorandum Summarizing Defendant's Positions (Docket No. 49, filed May 16, 2001).

### II. Procedural Background

Plaintiff, an attorney, was employed as an associate of the defendant Lyne, Woodworth & Evarts LLP (the "LLP defendant") from 1989 until 1997. Plaintiff's employment with the LLP defendant was terminated in February of 1997. In July of 1997, plaintiff filed a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD"). In August of 1999, the LLP defendant gave notice to the MCAD that it intended to preserve its right to a jury trial. By order dated March 27, 2000, the MCAD dismissed so the case could proceed to a final factual adjudication in court. Plaintiff filed suit in this court on August 17, 2000. The LLP defendant's first filed document in this court was a Motion for Summary Judgment (Docket No. 24, filed November 6, 2000).

On February 20, 2001, the parties submitted a Joint Local Rule 16.1 Statement in preparation for a scheduling conference set for March 1, 2001 (Docket No. 33, filed February 20, 2001). The Statement included the following "Proposed Agenda for Scheduling Conference":

A. The plaintiff request [sic] that this Court address a preliminary legal issue, namely the proper identity of the defendant to this action. Plaintiff named as defendants the individual partners of Lyne, Woodworth and Evarts, LLP based upon well-settled Massachusetts law. *See Shapira v. Budish,* 275 Mass. 120, 126 [175 N.E. 159] (1931) (generally, all partners should be made parties); M.G.L. c. 108A, § 15(3)(c) (registration as a limited liability partnership does not affect the persons on whom process may be served in an action against the partnership). Defense counsel appeared solely on behalf of the partnership entity, Lyne, Woodworth and Evarts, LLP and uses a caption which designates the partnership entity as the sole defendant to this action. Plaintiff's understanding that the individual partners are the proper defendants to this action is the basis of her pending motions to default two individual defendants who are former partners of Lyne, Woodworth & Evarts, LLP. *See Request for Entry of Default Against Defendant John P. Carr* and *Request for Entry of Default Against Defendant Joseph H. Skerry, III,* filed October 10, 2000, and *Defendant's Opposition to Plaintiff's Requests for Default* filed October 18, 2000.

Joint Local Rule 16.1 Statement, Docket No. 33, filed February 20, 2001, at 1–2.

At the scheduling conference held on March 1, 2001, the court deferred ruling on defendant's motion for summary judgment in light of the dispute as to the proper defendants in this action. The court, having directed the parties to brief the issues of limited liability partnership and successor liability, set a case management conference for oral argument on this issue for April 11, 2001. In response to the court's order, the LLP defendant filed a Memorandum in Response to the Court's

Questions Concerning Limited Liability Partnerships (Docket No. 38, filed March 26, 2001). In this document, the LLP defendant asserted:

> the undersigned counsel represents *only* the LLP defendant. If plaintiff is asserting claims against present and/or past partners individually, with the intention of reaching those partners' personal assets, the undersigned counsel has no authority to speak for any of the individual partners.

Docket No. 38 at 1. The LLP defendant further argued that if the plaintiff intended to reach the assets of those individual partners, a potential conflict of interest among the partners exists, and a continuance to enable those partners to obtain separate counsel would be necessary. *Id.* at 5–6.

Plaintiff responded by filing both a First Amended Complaint (Docket No. 40, filed April 10, 2001) and the document captioned Plaintiff's Response to Defendants' Memorandum in Response to the Court's Questions Concerning Limited Liability Partnerships (Docket No. 41, filed April 10, 2001). The First Amended Complaint added a "Count III" to the original two counts of the complaint (Count I for sex discrimination under Title VII, 42 U.S.C. § 2000e-5 and Count II for sex discrimination under Massachusetts General Laws c. 151B). Count III of the First Amended Complaint is entitled "Liability for Partnership Wrongs," and includes the following paragraph:

> 71. The liability of the defendant law firm for discriminating against plaintiff arises in whole or in part from each individual partner's own negligence, wrongful acts, errors or omissions. Thus, through the above-described conduct, each of the partners is jointly and severally liable to plaintiff under M.G.L.

c. 108A, § 15(3) for the damage caused by the law firm's discriminatory decision to deny her partnership.

First Amended Complaint, Docket No. 40, filed April 10, 2001, at 14. Plaintiff's Memorandum addressing the question of partnership liability in a Limited Liability Partnership contained, among other things, the following argument:

> Naming the partnership through its partners does not change the essence of Dow's discrimination suit. Because anti-discrimination statutes target decisions rather than decisionmakers, Dow is not required to prove that each partner who voted against her harbored conscious gender-based animus. *See Thomas [v. Eastman Kodak Co.,* 183 F.3d 38, 60 (1st Cir.1999)]. "If the plaintiff [shows] that she was treated less favorably because of her gender, ... 'the fact that some or all of the partners ... may have been unaware of that motivation, even within themselves, neither alters the fact of its existence nor excuses it.'" *Id.* (quoting *Hopkins v. Price Waterhouse,* 825 F.2d 458, 469 (D.C.Cir.1987)); *see also* Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment at 18 (explaining why LW & E's "single vote" rule does not preclude Dow from showing that the decision to deny partnership violated discrimination law).

. . . . .

If the decision to reject Dow is found to be discriminatory, the LLP defendant will be liable, that is, it will be responsible for satisfying the judgment from LW & E assets. But as defense counsel acknowledges, individual partners may also be liable for this partnership debt, if the debt "aris[es] in whole or in part from such partner's own negligence, wrongful acts, errors, or omissions."

Plaintiff's Response to Defendants' Memorandum in Response to the Court's Questions Concerning Limited Liability Partnerships, Docket No. 41, filed April 10, 2001, at 5–6.

The parties appeared before this court for a case management conference on April 11, 2001. At that case management conference, faced with conflicting arguments from the parties as to the status of the First Amended Complaint, the status of the individual partners as parties in this case, and the effect of the Limited Liability Partnership statute on partnership liability, this court ordered the parties to file simultaneous submissions, setting forth each and every argument they wished to make, to be filed April 25, 2001. The court also ordered simultaneous responses to be filed on May 16, 2001, and set oral argument on these matters for May 31, 2001, at 12:00. The parties filed the ordered submissions (*see* Memorandum Summarizing Defendant's Positions (Docket No. 46, filed April 26, 2001); Plaintiff's Supplemental Memorandum on Partnership Liability for Discriminatory Decisions and Personal Liability of LLP Partners for Partnership Wrongs (Docket No. 47, filed April 26, 2001); Plaintiff's Response to Memorandum Summarizing Defendant's Positions (Docket No. 48, filed May 16, 2001); and Response Memorandum Summarizing Defendant's Positions (Docket No. 49, filed May 16, 2001)).

At oral argument held on May 31, 2001, the parties addressed both the merits of defendant's motion for summary judgment and questions about the liability of the partners of the LLP defendant in light of its status as a Limited Liability Partnership.

### III. Factual Background

Defendant, in its Statement of Material Facts as to Which There Is No Genuine Issue, states the factual background rele-

vant to its pending motion for summary judgment in the following way:

1. Plaintiff, Attorney Andrea C. Dow (hereinafter "Dow") was employed as an associate attorney by LWE.LLP, from September 1989 until April 1997.

. . . . .

4. Dow pressed LWE.LLP for partnership in the firm in June 1996.

5. Consistent with the provisions of the Uniform Partnership Act, Mass.G.L. c. 108A, § 18(g), LWE.LLP has operated on the basis that a single negative vote of any partner is effective to deny admission to partnership.

6. Dow was informed and was aware that a single negative vote was effective to deny partnership.

7. On January 8, 1997, the LWE. LLP partners met and considered Dow's candidacy for partnership. Not a single partner spoke in favor of making Dow a partner, and several partners spoke against that action.

8. On February 5, 1997, Dow was informed that she would not be made a partner, and that her employment as an associate was being terminated, but that she would be permitted to remain for up to three months, May 13, 1997, in order to give her time to seek other employment.

. . . . .

11. On July 11, 1997, Dow filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination (hereinafter "MCAD"), alleging that she had been denied admission to partnership on account of her gender.

12. As of the date of Dow's departure, there were thirteen LWE.LLP partners and three contract partners who had joined the firm in 1996 as lateral transfers from Cuddy Bixby.

13. All thirteen LWE.LLP partners, one of whom is female, plus the transfer partner involved in Dow's termination, submitted affidavits to the MCAD specifically denying, under oath, that Dow's gender played any role in her failure to win partnership, and citing the deficiencies in Dow's performance which had decided them against making her a partner.

14. The affidavits of the LWE.LLP and contract partners are voluminous and the reasons cited for Dow's failure to win partnership are many and varied, but the common threads that run through the affidavits are critical of Dow's legal analytical skills, her ability to work unsupervised, the quality of her writing, the quality and energy of her research, her work ethic, her judgment, and her abrasive personality.

15. Notes of partners' comments, recorded as part of the associate performance review process between 1993 and 1996 by Aiello and McParlin, refer both to Dow's attributes and her shortcomings that were discussed with Dow at her annual reviews.

16. Because of Dow's performance, on some occasions her raises were proportionately lower than those given to other associates. Dow complained about some of her raises, and complained that she received the same Christmas bonus as an associate who was junior to her.

Defendant's Statement of Material Facts as to Which There Is No Genuine Issue, Docket No. 25, filed November 6, 2000, at 1–3 (internal citations omitted). Defendant's Statement of Facts goes on to discuss in detail the allegations in the affidavits of the LLP defendant's partners regarding Dow's alleged shortcomings in the area of legal research and writing, Dow's "Inability To Get Along With Part-

ners," *id.* at 5–7, and "Other Perceived Dow Shortcomings," *id.* at 7–8.

Plaintiff, in her Statement of Material Facts of Record As to Which There Exist a Genuine Issue to Be Tried, disputes the majority of defendant's assertions. *See* Plaintiff's Statement of Material Facts of Record As to Which There Exist a Genuine Issue to Be Tried, Docket No. 29, filed December 5, 2000, at 12–16 ("Plaintiff's Specific Response to Defendant's Statement Of 'Undisputed' Material Facts"). Plaintiff also submits a "Statement of Undisputed and Disputed Facts From Which A Jury Could Find that Defendants Discriminated Against Plaintiff on Account of Gender." *See* Docket No. 29 at 1–12. In this Statement, plaintiff discusses the one other female associate who was considered for and denied partnership. Plaintiff also discusses the positive feedback, both verbal and in terms of salary and raises, she received during her tenure. Plaintiff alleges that a number of representations were made to her by partners involving her future at the firm, and that she was told on more than one occasion that she was "partnership material." Plaintiff then attacks the representations made by the partnership in their affidavits in support of defendant's Motion for Summary Judgment:

> The partners' wholesale attack on Dow's legal abilities, intelligence and even personality is patently incredible. Indeed, the MCAD considered the very same affidavits and found probable cause for Dow's sex discrimination claim, calling the affidavits "suspect." According to [senior litigation partner George] Donovan, no associate "would be working [at the firm] very long if they didn't have a basic grasp of the law to begin with." Dow lasted nearly eight years, notwithstanding the alleged serious and comprehensive deficiencies which the partners attribute to nearly all aspects of her performance in this litigation.

Contrary to Defendants' assertions, the affidavits are *not* consistent with the available contemporaneous notes of partners' comments regarding Dow recorded between 1993 and 1996. Moreover, the full set of notes reflecting comments about all associates, as opposed to the excerpts regarding Dow relied upon by the defendant, show that the partners perceived all of the firm's associates as having a mixed set of strengths and weaknesses. Indeed, the full set of notes reflect negative comments about certain aspects of each associate's legal ability and style, not just Dow's.

Tellingly, the perceived weaknesses of the two male associates elected to the partnership during Dow's tenure, (i.e., [Dom] Aiello's "chief drawback," of lack of aggressiveness, and [Jay] Skerry's not being "top notch" in writing and analysis and his being too "excitable") did not stand in their way. In addition, neither man was praised for the skills which Dow was praised for, namely advocacy, client relations and business development skills. Even the one male associate denied partnership during Dow's tenure, Steven Roach, had the support of nearly all partners, including Donovan, despite Donovan's "significant reservations" about Roach's analytic ability and writing and the serious criticism of other partners.

*Id.* at 7–9 (internal citations omitted) (footnotes omitted). Plaintiff's Statement goes on to allege what she believes are the "real reasons" that she was denied partnership. These allegations are discussed in detail below.

## IV. Defendant's Motion for Summary Judgment

### A. The Applicable Legal Standard

The Court of Appeals for the First Circuit has endorsed a two-phase process to

be used by the trial court when deciding motions for summary judgment. *Cadle Co. v. Hayes,* 116 F.3d 957, 960 (1st Cir. 1997). In phase one, a preliminary showing must be made, by the movant, that no genuine issues of material fact exist that would require resolution at trial. *Id.* If the movant satisfies this burden, then the non-movant, in phase two, must "demonstrate, through specific facts, that a trial-worthy issue remains." *Id.* If the non-movant fails to submit a showing of specific facts as required in this two-phase process, the court orders judgment as a matter of law for the moving party.

Issues of fact are in "genuine" dispute if they "may reasonably be resolved in favor of either party." *Id.* Facts are "material" if they possess "the capacity to sway the outcome of the litigation under applicable law." *Id.* The facts in genuine dispute must be significantly probative in order for summary judgment to be denied; "conclusory allegations, improbable inferences, and unsupported speculation will not suffice." *Id.*

▪ In the context of a suit alleging discrimination on the basis of gender, we turn to the "familiar burden-shifting framework" of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) to determine whether Dow has "establish[ed] a trial-worthy issue by presenting 'enough competent evidence to enable a finding favorable to the non-moving party.'" *LeBlanc v. Great American Ins. Co.,* 6 F.3d 836, 842 (1st Cir.1993), quoting *Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993).

*McDonnell Douglas* and subsequent decisions have "established an allocation of the burden of production and an order for the presentation of proof in ... discriminatory-treatment cases." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The first hurdle is for the plaintiff to establish a prima facie case of discrimination. *Id. See also Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). At this first stage, Dow must show that (1) she was within a protected class, (2) possessed the necessary qualifications for, and adequately performed, her job, (3) but was nevertheless dismissed, and (4) the defendant sought someone of roughly equivalent qualifications to perform substantially the same work. *See Byrd v. Ronayne,* 61 F.3d 1026, 1030–31 (1st Cir.1995).

If Dow is able to establish a prima facie case of discrimination, the LLP defendant will need "to articulate a legitimate, non-discriminatory reason for its adverse employment action by identifying enough admissible evidence to support a rational finding that unlawful discrimination was not the cause of the employment action." *Straughn v. Delta Air Lines, Inc.,* 250 F.3d 23, 33 (1st Cir.2001) (internal citations omitted). If the LLP defendant proffers "a nondiscriminatory reason for its action, the burden shifts back to the plaintiff to show that the reason proffered was 'a coverup' for a 'discriminatory decision.'" *Feliciano de la Cruz v. El Conquistador Resort and Country Club,* 218 F.3d 1, 6 (1st Cir.2000) (quoting *McDonnell Douglas,* 411 U.S. at 805, 93 S.Ct. 1817). At that point, Dow's "burden of producing evidence to rebut the stated reason for [the LLP defendant's] employment action" would "merge with the ultimate burden of persuading the court that she was the victim of intentional discrimination." *Id.* (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089) (internal quotation marks omitted).

The LLP defendant cannot prevail on its motion for summary judgment, however, if "the record includes sufficient competent evidence from which a reasonable jury

'could (although it need not) infer that the employer's claimed reasons for terminating the employment were pretextual and that the decision was the result of discriminatory animus.'" *Straughn*, 250 F.3d at 34 (quoting *Dominguez–Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 431 (1st Cir. 2000)). The Court of Appeals for the First Circuit has stated that district courts must "exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent." *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir.2000) (citing *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 167 (1st Cir.1998)).

## B. The Merits of Defendant's Motion

### 1. Plaintiff's Claims Under M.G.L. 151B

Defendant first contends that plaintiff's claim under Massachusetts General Laws c. 151B is barred because it is untimely. Defendant states its contention in the following way:

> Plaintiff's state cause of action is brought pursuant to the provisions of Mass.G.L. c. 151B, § 9. Mass.G.L. c. 151B created both the right and the remedy for sexual discrimination; there is no common law remedy. *Sereni v. Star Sportswear Mfg. Corp.*, 24 Mass. App.Ct. 428 [509 N.E.2d 1203] (1987). *Melley v. Gillette Corp.*, 19 Mass.App.Ct. 511 [475 N.E.2d 1227], *aff'd* 397 Mass. 1004 [491 N.E.2d 252] (1986). Absent the statute, Dow has no recognized cause of action under state law for sexual discrimination.
>
> Because Dow is proceeding under a right created by statute, she is required to adhere to the requirements of that statute. Mass.G.L. c. 151B, § 9 specifies when and how Dow may commence a court action for sexual discrimination. Dow may not commence a court action unless she first files with the MCAD. *Melley, supra,* 19 Mass.App.Ct. at 511 [475 N.E.2d 1227]. Thereafter, the period of time within which Dow may file a superior court action as a matter of right is any time commencing six months after filing with MCAD "but no later than three years after the alleged unlawful practice occurred." Mass.G.L. c. 151B, § 9.

The alleged unlawful act occurred February 5, 1997. The three year period within which Dow was authorized to file a superior court action therefore expired February 4, 2000. Dow failed to file any court action within three years of the date of that alleged unlawful act. The statute does not authorize filing a court action thereafter. Hence, Dow's court action for violation of Mass G.L. c. 151B, first filed on August 17, 2000, must be dismissed as untimely. The jurisdiction of all trial courts of this Commonwealth is limited to that granted by the Legislature. *Police Comm'r of Boston v. Municipal Ct. of the Dorchester Dist.*, 374 Mass. 640, 662–663, 374 N.E.2d 272 (1978). "[A] party cannot by his own action confer actual jurisdiction upon a court, which by statute has no jurisdiction of the subject matter." *Connolly v. Phipps*, 283 Mass. 584, 586, 186 N.E. 646 (1933).

Dow seeks to circumvent the plain and unambiguous time limitation of Mass. G.L. c. 151B, § 9, and the consequences of her untimely filing, by asserting that her "Chapter 151B § 9 claim is subject to equitable tolling from September 7, 1999, the date upon which the MCAD took the parties' position on pre-hearing dismissal for a jury trial under advisement, to March 29, 2000, the date plaintiff received notice of the dismissal order." Complaint ¶ 25. There is no basis for applying the doctrine of equitable

tolling to Dow's c. 151B claim under either state or federal precedent.

Memorandum in Support of Defendant's Motion for Summary Judgment, Docket No. 26, filed November 6, 2000, at 2–3.

Plaintiff, in response, makes the following argument:

> ...Defendants' arguments miss the point. To be entitled to equitable tolling, Dow does not have to claim to have been ignorant of the three year limitations period imposed by Chapter 151B, nor does she have to claim to have been misled by Defendants regarding their desire for a jury trial. Rather, Dow contends that tolling is warranted here because of the inequitable position she was placed in by the following three developments: first, the Supreme Judicial Court's decision in *Lavelle v. MCAD*, 426 Mass. 332 [688 N.E.2d 1331] (1997), which found that Chapter 151B respondents have a constitutional right to trial by jury; second, the arguably ultra vires dismissal regulation adopted by the MCAD in response to *Lavelle;* and third, the timing of the MCAD's decision to dismiss her claim under that regulation.

Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment, Docket No. 30, filed December 5, 2000, at 2–3.

██ In order for this court to determine whether plaintiff should be allowed to go forward on her claims under M.G.L. 151B, this court would have to decide unsettled questions of state law involving the interpretation of the *Lavelle* decision, the interpretation of the MCAD dismissal regulation, and the application of both of these legal rulings to the common law of equitable tolling, waiver, and equitable estoppel. It is ordinarily inappropriate for a federal court to predict "trailblazing" decisions of state courts. A more appropriate method of assuring a correct outcome on the merits in a particular case is certification of unsettled questions of state law to the state's highest court. An alternative method would be to stay this proceeding to allow plaintiff to seek a declaratory judgment of her rights under Massachusetts law in Massachusetts Superior Court. At the next case management conference, scheduled in the order below, the court will hear the parties' arguments as to which approach, certification or a stay of proceedings, is the appropriate action in this case. If either party wishes to argue for certification of a question to the Massachusetts Supreme Judicial Court, the parties should be prepared to discuss the exact wording of the question to be certified.

## 2. Plaintiff's Claims Under Title VII

### a. The Appropriate Legal Framework

The first question before this court in considering defendant's motion for summary judgment is whether to consider plaintiff's claims under the "pretext" approach laid out in *McDonnell Douglas* and related cases or under the "mixed motive" approach of *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). The Court of Appeals for the First Circuit explained the differences between these two frameworks in the following way:

> A plaintiff alleging disparate treatment ... usually proceeds by means of the familiar framework engendered in *McDonnell Douglas Corp. v. Green* ... (customarily called the "pretext" approach) .... What is significant for present purposes is that, under pretext analysis, the burden of persuasion remains with the plaintiff throughout the case.

> In some situations, however, a plaintiff may be entitled to use an approach

that relieves her of this unremitting burden of persuasion. The key that unlocks this door is the existence of direct evidence that a proscribed factor (such as age, gender, race or national original) played a motivating part in the disputed employment decision.... Such evidence, if accepted by the factfinder, shifts the burden of persuasion to the employer, who then must establish that he would have reached the same decision regarding the plaintiff even if he had not taken the proscribed factor into account. Although the plaintiff's initial burden under this "mixed-motive" approach is heavier than the *de minimus* showing required to establish a prima facie case under the pretext approach, most plaintiffs perceive the *Price Waterhouse* framework and its concomitant burden-shifting as conferring a pronounced advantage.

*Febres v. Challenger Caribbean Corporation*, 214 F.3d 57, 59–60 (1st Cir.2000) (internal citations omitted).

Plaintiff asserts that she "can prove her case under the mixed motive framework using direct evidence to show gender was a motivating factor in LWE's decision to deny her partnership," and further argues that she could also prevail under the pretext framework, as "[t]here is more than enough circumstantial evidence to create a genuine issue whether [the] firm's purported reasons for rejecting Dow were pretextual." Docket No. 30 at 11, 15. Defendant does not address whether plaintiff has proffered sufficient "direct evidence" to go forward under the mixed motive framework, and concentrates instead on arguing that Dow has failed to establish a prima facie case or to show pretext under the pretext framework.

Because I conclude, as explained in Part IV(B)(2)(b), below, that plaintiff's claims survive defendant's motion for summary judgment under a pretext analysis, I do not evaluate here whether plaintiff has produced direct evidence of discrimination and would be entitled to a "mixed motive" instruction to a jury. "Should such a decision prove material it would be better made after the development of the evidence." *Dominguez–Cruz,* 202 F.3d at 434. "A plaintiff ... may elect to proceed simultaneously on both fronts (mixed-motive and pretext), cognizant that the trial court, at an appropriate stage of the litigation, will channel the case into one format or another." *Fernandes v. Costa Bros. Masonry, Inc.,* 199 F.3d 572, 581 (1st Cir. 1999). The comments allegedly made by various partners of the LLP defendant can be considered as part of plaintiff's argument that defendant's proffered reasons for her dismissal were a pretext for discrimination. I consider these comments in that context, below, without now making a decision about whether these comments constitute "direct evidence" of discrimination under any of the standards contemplated by the Court of Appeals for the First Circuit. *See Fernandes,* 199 F.3d at 582–83.

### b. Plaintiff's Claims under the Pretext Analysis

Under the pretext approach of *McDonnell Douglas,* the first question for the court is whether plaintiff has made out a prima facie case of discrimination. As explained above, to establish a prima facie case, plaintiff must show (1) she was within a protected class, (2) possessed the necessary qualifications for, and adequately performed, her job, (3) but was nevertheless dismissed, and (4) the defendant sought someone of roughly equivalent qualifications to perform substantially the same work. *See Byrd v. Ronayne,* 61 F.3d 1026, 1030–31 (1st Cir.1995). Defendant argues that plaintiff has not succeeded in establishing a prima facie case:

Although Dow is a female, and hence within a "protected class," Dow has made no showing that similarly situated males were treated more favorably. Indeed, a male associate, with more time in grade, who was considered and passed over for partnership a year earlier, was a substantially better qualified associate than Dow. Dow also can make no showing that she was qualified for partnership.

Docket No. 26 at 7–8 (internal citations omitted). Defendant misstates the burden on plaintiff to make out a prima facie case. Plaintiff need not show that she was passed over in favor of similarly situated males; instead, plaintiff may simply show that after her dismissal, the partnership "had a continued need for someone to perform the same work." *Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 155 (1st Cir.1990). The Court of Appeals for the First Circuit stated in the *Cumpiano* decision that this prong of the *McDonnell Douglas* test was "never intended to be rigid, mechanized, or ritualistic." *Id.* Although plaintiff has not proffered direct evidence that the LLP defendant continued to review candidates for partnership after her dismissal, I will assume on the record before me that the partnership did not close its doors to all future partners from that moment forward.

■ Defendant also misstates the meaning of "qualified" for the purpose of the prima facie case. Plaintiff need not show that she was "qualified" for partnership in the sense that she was clearly entitled to partnership; rather, plaintiff must merely show "that she was sufficiently qualified to be among those persons from whom a selection, to some extent discretionary, would be made." *Fields v. Clark University*, 966 F.2d 49, 53 (1st Cir.1992). The record before this court

shows that plaintiff had been an associate with the LLP defendant for nearly eight years. Although plaintiff received mixed reviews during her tenure, her reviews were not substantially different from the reviews of other associates who were granted partnership. I conclude that plaintiff has shown by a preponderance of the evidence that she was sufficiently qualified to be among those associates considered for partnership, and that plaintiff has met the other elements of a prima facie case by a preponderance of the evidence.

■ Under the next step of the *McDonnell Douglas* framework, the LLP defendant must "articulate a legitimate, nondiscriminatory reason for its adverse employment action by identifying enough admissible evidence to support a rational finding that unlawful discrimination was not the cause of the employment action." *Straughn*, 250 F.3d at 33 (internal citations omitted). I conclude that the LLP defendant has met this burden and has proffered admissible evidence to support a genuine, rather than pretextual, reasoned finding that plaintiff was dismissed because the members of the partnership considered her to be professionally unqualified for admission to the partnership. As the LLP defendant has proffered this nondiscriminatory reason, "the burden shifts back to the plaintiff to show that the reason proffered was 'a coverup' for a 'discriminatory decision.'" *Feliciano de la Cruz*, 218 F.3d at 6 (quoting *McDonnell Douglas*, 411 U.S. at 805, 93 S.Ct. 1817).

■ Before addressing whether plaintiff has met this final burden, this court must first address a consistent theme in defendant's arguments, which I will refer to as defendant's "single vote" theory. Defendant, in its motion for summary judgment, summarizes this contention in the following way:

Dow's causes of action under both Title VII and Mass.G.L. c. 151B must fail because under firm rule, a single partner's negative vote was effective to deny partnership, and the evidence would not warrant a finding that all of the partners opposed Dow's partnership on account of her gender.

Defendant's Motion for Summary Judgment, Docket No. 24, filed November 6, 2000, at 1. In its Memorandum in Support, defendant elaborates on the "single vote" theory:

> The important context here is that a single "no" vote is enough to deny partnership at LWE. Dow's marshaling of perceived sleights to her and alleged comments to others over the course of her employment does not warrant a finding that *any* LWE.LLP [sic] refused to support her candidacy for admission to partnership on account of her gender. It is inconceivable that *all* fourteen attorney/affiants, independently or in conspiracy, decided to deny partnership to Attorney Dow because of her gender, and to fabricate the various reasons set forth in their respective affidavits, in order to mask a unanimous discriminatory animus.

> If one single partner is telling the truth about his or her reasons for rejecting Attorney Dow, then she has not been harmed, because that one partner's veto was enough to deny her partnership. Attorney Dow cannot establish that all fourteen attorney/affiants are lying. In fact, all are telling the truth.

> The issue here is not whether the single-veto rule is too harsh. We know from *Ezold* [*v. Wolf, Block, Schorr & Solis–Cohen,* 983 F.2d 509 (3rd Cir. 1992) ] that a law firm is entitled to utilize demanding criteria for partnership, so long as those criteria are not gender based.

Docket No. 26 at 13–14.

Plaintiff, in her opposition, addresses this contention only in a footnote. *See* Docket No. 30 at 12 n. 10. In later documents filed with this court, however, plaintiff characterizes this argument as "utterly wrong," arguing that plaintiff

> (i) does not need any direct evidence of discriminatory animus; (ii) need not demonstrate conscious animus on the part of any partner, much less all of the partners; and (iii) need not surmount any additional proof hurdles because LW & E is a partnership that requires unanimity for the admission of new partners.

Supplemental Memorandum on Partnership Liability for Discriminatory Decisions and Personal Liability of LLP Partners for Partnership Wrongs, Docket No. 47, filed April 26, 2001, at 5. *See also* Docket No. 47 at 6–9.

■ Defendant's "single vote" theory, if accepted by this court, would insulate any partnership that used a single-veto method in its partnership determinations from liability for discrimination. Defendant's argument would mean that so long as one single partner did not harbor a discriminatory reason for a negative vote, the employee could not have suffered any harm, even in the face of discriminatory animus on behalf of the majority of the partnership. This position is inconsistent with the governing law of discrimination, articulated by the United States Supreme Court and the Court of Appeals for the First Circuit. It is well-settled that a plaintiff need not prove "intentional" discrimination. In *Thomas v. Eastman Kodak Company,* 183 F.3d 38 (1st Cir.1999), the Court of Appeals for the First Circuit endorsed the position of the Court of Appeals for the District of Columbia Circuit, articulated in

**264**

*Hopkins v. Price Waterhouse,* 825 F.2d 458, 469 (D.C.Cir.1987) and affirmed in relevant part by the Supreme Court. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 250–52, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion). In *Thomas,* the Court of Appeals for the First Circuit stated:

> [T]he disparate treatment doctrine focuses on causality rather than conscious motivations, since unwitting or ingrained bias is no less injurious or worthy of eradication than blatant or calculated discrimination. If the plaintiff has shown that she was treated less favorably because of her gender ... the fact that some or all of the partners ... may have been unaware of that motivation, even within themselves, neither alters the fact of its existence nor excuses it.

*Thomas,* 183 F.3d at 60 (internal citations omitted). If a plaintiff does not need to prove conscious motivation on the part of any particular partner, it would be bizarre to allow a defendant to insulate itself from liability by proving a lack of conscious or unconscious motivation on behalf of one particular decision-making individual.

Also, to allow a partnership to escape liability in this way would be contrary to the public policy manifested in the anti-discrimination laws of the United States and of the Commonwealth of Massachusetts. One objective of these laws is to protect employees from discrimination on the basis of gender. The law, properly understood and applied, does not allow this protection to be frustrated by an employer's structuring its decisionmaking process in a way that almost inevitably defeats the protection. Although an employer can invoke strict criteria in making its decisions, the process cannot be developed so that it places an impossible burden of persuasion on a plaintiff. "The broad, overriding interest, shared by employer, employee, and consumer, is efficient and trustworthy workmanship assured through fair and racially neutral employment and personnel decisions. In the *implementation* of such decisions, it is abundantly clear that Title VII tolerates no racial discrimination, subtle or otherwise." *McDonnell Douglas Corp.,* 411 U.S. at 801, 93 S.Ct. 1817 (emphasis added). Allowing a "single vote" rule to vastly increase plaintiff's burden of proof would be contrary to both policy and precedent.

 Even though defendant cannot use the "single vote" theory as an impenetrable shield against liability, the burden on plaintiff at this point in the *McDonnell Douglas* analysis is heavy. Plaintiff must "present sufficient evidence to show both that the employer's articulated reason ... is a pretext and that the true reason is discriminatory." *Santiago–Ramos,* 217 F.3d at 53 (*quoting Thomas,* 183 F.3d at 56). This burden "merges with the ultimate burden of persuading the court that she was the victim of intentional discrimination." *Feliciano de la Cruz,* 218 F.3d at 6 (1st Cir.2000). "Viewing the aggregate package of proof offered" by plaintiff, and "taking all inferences in her favor," however, I conclude that plaintiff has proffered sufficient evidence from which a reasonable jury could find that defendant's proffered reason for plaintiff's dismissal is pretext and that the real reason was discriminatory. *Santiago–Ramos,* 217 F.3d at 54.

Regardless of whether or not the evidence that plaintiff has characterized as "direct evidence" of discrimination, *see* Part IV(B)(2)(a), above, is appropriately labeled as "direct" rather than circumstantial, I conclude that it is evidence that a finder of fact might treat as some evidence that the proffered reasons are pretext for discrimination. "One method [of establishing pretext] is to show that discriminatory

comments were made by the key decision-maker or those in a position to influence the decisionmaker." *Santiago–Ramos*, 217 F.3d at 55. Plaintiff alleges that attorney Carr, a partner in the litigation group, made a number of comments that reflect a discriminatory animus. *See* Docket No. 30 at 11. Plaintiff further alleges that attorney Carr was in a position of influence in the firm. *See id.* at 12. Taking the evidence in the light most favorable to plaintiff, the non-moving party, I conclude that the comments made by Carr could be reasonably considered by a jury to be evidence of pretext. Even if these remarks are characterized as "stray remarks," the Court of Appeals for the First Circuit has stated that "stray remarks may properly constitute evidence of discriminatory intent for the jury to consider in combination with other evidence." *McMillan v. Massachusetts Soc. for Prevention of Cruelty To Animals*, 140 F.3d 288, 300 (1st Cir. 1998).

■ Plaintiff further argues that the admissions by several partners in their affidavits that they considered her gender as a positive attribute in making their employment decision is "direct evidence" that "reflects directly the alleged discriminatory animus" and "bear[s] squarely on the contested employment decision." Docket No. 30 at 14 (*quoting Fernandes*, 199 F.3d at 582). The *Fernandes* decision, however, cautions against taking comments such as these as "direct evidence," as the Court of Appeals for the First Circuit in that case stated that "statement[s] that plausibly can be interpreted in two different ways—one discriminatory and the other benign—[do] not directly reflect illegal animus and ... do not constitute direct evidence." *Fernandes*, 199 F.3d at 583. Nevertheless, in *Fernandes*, the Court of Appeals for the First Circuit, considering the ambiguous comments

made in that case in the course of the pretext analysis, held that the comments "taken in the light most favorable to the [plaintiffs], add[ed] the necessary element of racial animus." *Id.* at 589. The same test applies here. Interpreting these comments in the light most favorable to the plaintiff, a reasonable jury could find that plaintiff was evaluated and judged on account of her gender, and that the decision to deny her partnership was affected by negative gender stereotypes.

■ Plaintiff's next argument in support of the contention that the reason given for her dismissal was pretext for gender discrimination is that the partners' affidavits reflecting plaintiff's weaknesses as an associate "are *not* consistent with the available contemporaneous notes of partners' comments regarding Dow recorded between 1993 and 1996." Docket No. 29 at 7–8 (emphasis in original). Plaintiff elaborates:

> Moreover, the full set of notes reflecting comments about all associates, as opposed to the excerpts regarding Dow relied upon by the defendant, show that the partners perceived all of the firm's associates as having a mixed set of strengths and weaknesses. Indeed, the full set of notes reflect negative comments about certain aspects of each associate's legal ability and style, not just Dow's.
>
> Tellingly, the perceived weaknesses of the two male associates elected to the partnership during Dow's tenure ... did not stand in their way. In addition, neither man was praised for the skills which Dow was praised for, namely advocacy, client relations and business development skills.

*Id.* at 8. A plaintiff can "establish pretext by showing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legiti-

mate reasons' such that a factfinder could 'infer that the employer did not act for the asserted nondiscriminatory reasons.'" *Santiago–Ramos*, 217 F.3d at 56 (quoting *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir.1998)). Accepting reasonable inferences in the plaintiff's favor for the purpose of decision on a motion for summary judgment against her, I conclude that plaintiff has raised a genuine issue of material fact, and that a jury could find that some of the reasons proffered by the partners were pretextual. I note further that even if a jury were to credit the veracity of the individual partners whose comments are cited as explanations consistent with the contemporaneous reviews of plaintiff's performance, the Court of Appeals for the First Circuit has recognized that subjective evaluations can be influenced by illegal animus. *See Thomas*, 183 F.3d at 62. Plaintiff here alleges that she was denied opportunities for training and professional development that were open to male associates, *see* Docket No. 29 at 2–3, and she has proffered supporting evidence from which a jury could find that the evaluations of plaintiff were influenced by discriminatory points of view.

 Plaintiff also cites numerous comments made by various partners of the LLP defendant, and argues that these comments demonstrate a general atmosphere of discrimination against women at the firm and that she was a victim of stereotyping. *See* Docket No. 29 at 9–10; Docket No. 30 at 17–18. Evidence of stereotyping, subject to appropriate instructions on the applicable law, can be considered by a jury in determining whether a plaintiff was subject to unlawful discrimination. *See Thomas* 183 F.3d at 59–61. *See also Price Waterhouse*, 490 U.S. at 249, 109 S.Ct. 1775 (plurality opinion) (stating that "[b]y focusing on [the plaintiff's] specific proof, ... we do not suggest a limitation on the possible ways of prov-

ing that stereotyping played a motivating role in an employment decision."). Furthermore, the evidence presented by plaintiff—including comments on plaintiff's appearance and attitude as well as a male dominated social atmosphere at the firm—may be evaluated by a jury as evidence of a discriminatory atmosphere in the firm as a whole. "Evidence of a company's general atmosphere of discrimination may be considered *along with any other evidence bearing on motive* in deciding whether a Title VII plaintiff has met her burden of showing that the defendants' reasons are pretexts." *Santiago–Ramos*, 217 F.3d at 55 (emphasis in original).

I conclude, after "viewing the aggregative package of proof offered by plaintiff and taking all inferences in the plaintiff's favor," that plaintiff has raised a genuine issue of material fact as to whether the termination of her employment was motivated by gender discrimination. *Dominguez–Cruz*, 202 F.3d at 431. The record before me includes sufficient competent evidence from which a reasonable jury could infer, although it is not compelled to do so, "that the employer's claimed reasons for terminating the employment were pretextual and that the decision was the result of discriminatory animus." *Straughn*, 250 F.3d at 34. Defendant's motion for summary judgment is denied in the order below.

## V. The Status of the Parties in this Case

The matter before me involves a twofold question of law that has not yet been decided by any court in the First Circuit, nor by any Court of the Commonwealth of Massachusetts. That question concerns (1) what circumstances must be shown to reach the assets of partners in a Limited Liability Partnership after a finding of partnership liability, and (2) what level of

proof of culpability is necessary for those assets to be reached by an injured plaintiff. This two-fold question is complicated by the law of liability for discrimination on the basis of gender under Title VII of the United States Code, 42 U.S.C. § 2000e-5, which allows for a finding of liability in the absence of discriminatory intent.

Plaintiff's argument rests on the contention that because each individual partner contributed to the decision to deny her partnership, each individual partner's negligence or wrongful act contributed in whole or in part to her injury, and each partner's non-partnership assets should be available to the plaintiff if plaintiff is unable to satisfy a judgment from the assets of the partnership. This contention, if accepted by this court, would vastly expand the scope of relief beyond that provided for in statutes and precedents regarding Limited Liability Partnerships.

Defendant contends, on the other hand, that unless plaintiff is suing each partner for individual liability (which she may or may not be able to do under the governing discrimination statutes), plaintiff will be unable to reach any of a partner's non-partnership assets, because all of the partners, as individuals, are protected both by the Limited Liability Partnership statute and by the partnership's "single-vote" rule, discussed above. Defendant's contentions, if accepted by the court, would sharply limit the scope of relief under the anti-discrimination laws of United States and the Commonwealth of Massachusetts.

I accept neither of these contrasting contentions about the scope of liability and relief available under the Limited Liability Partnership statute, M.G.L. c. 108A, § 15. I do not, however, decide at this time unsettled questions regarding what proof plaintiff will have to make to reach the non-partnership assets of any individual partner if she prevails in her suit against the partnership under a discriminatory impact theory. I need not decide that question at this time because I conclude that the claim against the partnership for liability can go forward, and that only if plaintiff prevails on that claim will it be necessary or appropriate to adjudicate questions regarding the liability and scope of relief against individual partners for partnership wrongs.

■ The default rule of partnership law, and the rule under Massachusetts law for many years, is that partners are jointly and severally liable for partnership wrongs. The Limited Liability Partnership was set up to allow limited liability partners to protect non-partnership assets against liability for the wrongs of the partnership under certain conditions:

(2) Subject to the provisions of paragraph (3), a partner in a registered limited liability partnership shall not be personally liable directly or indirectly; including, without limitation, by way of indemnification, contribution, assessment or otherwise, for debts, obligations and liabilities of or chargeable to such partnership, whether in tort, contract or otherwise arising while the partnership is a registered limited liability partnership.

(3) Paragraph (2) shall not affect (a) the liability of a partner in a registered limited liability partnership arising in whole or in part from such partner's own negligence, wrongful acts, errors or omissions, (b) the availability of partnership property to satisfy debts, obligations and liabilities of the partnership or (c) the persons on whom process may be served in an action against the partnership.

M.G.L. c. 108A, § 15(2)-(3).

■ Ordinarily individuals are not liable as individuals under the anti-discrimi-

nation statutes, Title VII and Chapter 151B. The liability is, at least primarily, a partnership liability.

 In a Limited Liability Partnership, limited liability partners cannot be vicariously liable for the torts of the partnership. The liability of each depends on proof of some wrongful act or omission by that individual partner. This statute does not mean that partners in a Limited Liability Partnership can *never* be liable in a discrimination suit. It means that the plaintiff must demonstrate that the individual partner was negligent or committed some other kind of wrongful act, error, or omission that produced discrimination against the plaintiff. This proof, however, need not come during a trial on partnership liability. Trying these separate contentions in one jury trial would run risks of confusion. Among the added complications of attempting to try all issues in one trial is that potential conflicts of interest likely to arise before this dispute is resolved, if plaintiff does succeed in proving LLP liability, and cannot collect in full from the LLP assets, would have to be explained to the jury and argued by counsel. Conflicts of interest for counsel might affect representation. *See* Part VI, below.

 I have concluded that in a trial limited to LLP liability, separate counsel for each individual partner will not be necessary to avoid conflicts of interest. The liability, or lack thereof, of the *partnership itself* is the threshold question, and a single attorney can represent that interest if the partnership so chooses. I do not hold that the individual partners may not obtain separate counsel to protect their interests; rather, I leave that choice to the individual partners themselves.

This case may proceed to a first-phase trial for adjudication on the merits against the partnership entity alone on the charges of gender discrimination. Unless otherwise ordered at a later date, this first-phase trial will not be designed to determine whether each partner's non-partnership assets may be reached to satisfy partnership liability for damages or other relief (including attorneys' fees, interest, and costs).

## VI. Professionalism of the American Bench and Bar

### A. Introduction

Because of the fundamental importance of assuring that no party's rights are adversely affected by that party's misunderstanding of the court's rulings with respect to law, in this opinion I make it clear that this case will be scheduled for trial. I have concluded that I cannot decide the case without holding a trial.

In the interest of clarity, I add in this Part VI an explanation of the perspective about professionalism in the American Bench and Bar, and conflicts of interest incident to professional obligations, that I conclude I must invoke in the performance of my professional role as trial judge in this case.

### B. Madisonian Influences on Bench and Bar Roles in the American Legal System

The roles of twenty-first century legal professionals in the Bar, Bench, and Academies in the United States owe much to James Madison's seminal thinking expressed publicly and privately during debates over the structure of the new form of related state and national governments to be established under a constitution drafted in May 1787 to cure deficiencies in the Articles of Confederation (1777). *See generally* John P. Kaminski, Ph.D, Director, and Richard Leffler, Ph.D., Co–Director, The Center for the Study of the American Constitution, The University of Wisconsin–

Madison, *The Origins of the Three Branches of Government*, Federal Judicial Center Traveling Seminar 3–9 (2001) (Wisconsin Study). As a reminder of timing of important events, I reproduce here excerpts from the Wisconsin Study's "Chronology of the American Revolutionary Era":

| 1774 September 5 | First Continental Congress |
| 1775 April 19 | Battles of Lexington and Concord |
| 1775 May 10 | Second Continental Congress |
| 1775 June 17 | Battle of Bunker Hill |
| 1776 July 4 | Declaration of Independence |
| 1777 November 15 | Congress Agrees to Articles of Confederation |
| 1781 March 1 | States Adopt Articles of Confederation |
| 1781 October 19 | British Surrender at Yorktown |
| . . . . | |
| 1786 Sept. 11–14 | Annapolis Convention (Proposes Constitutional Conv.) |
| 1787 February 21 | Congress Calls Constitutional Convention |
| 1787 May 25 | Constitutional Convention Meets |
| . . . | |

Professionalism of persons educated in law, as it came to be recognized in the United States in the late nineteenth century and the early decades of the twentieth century, did not exist in the time of the Founders. Its development owed much to the Founders' ideas about the roles of impartial judges, and advocates who would appear before them. The earliest readily accessible record of public discussion of ideas about developing a corps of impartial judges and advocates is the record of communications occurring, publicly and privately, as the Founders proceeded with their drafting of a proposed constitution. We now have an increased treasure trove of records of these spirited debates that includes materials gathered, pruned, edited, and published, along with incisive commentary, by the Directors of the Wisconsin Study. *See, e.g., The Origins of the Three Branches of Government, supra.*

Strangely, at least from the perspective of twenty-first century mores of communication, a large part of the essence of those debates was exposed contemporaneously in publications more like twentieth and early twenty-first century newspapers than books, or magazines, or professional journals. That large body of expressions is available to interested twenty-first century readers in collections commonly referred to as "federalist" papers or, in terminology perhaps suggestive of an effort to be less biased in collecting and editing, "federalist and anti-federalist."

Those eighteenth-century debates occurred more than two centuries ago. Twenty-first century readers are even more removed than the lapse of time suggests from being in tune with the spirit and culture surrounding the debates over what became the Constitution of the United States and the Bill of Rights embodied in the Amendments adopted forthwith. Those debates were strikingly lively and thorough examinations of the history of peoples' ideas and efforts to form governments powerful enough to preserve the order essential to protection of individual liberty and at the same time subject to inherent controls against abuse of power likely to lead to despotism.

Ideas about liberty and order are no less relevant now than they were when the Founders developed the distinctive form of federalism that is the genius of the document we call the Constitution of the United States of America. "The aim of the American legal system is liberty and justice for all. How close we come to that aim depends on good judging." Robert E. Keeton, *Judging in the American Legal System* 1 (Lexis Law Publishing 1999). The quality of judging in a legal system depends on commitment. It depends, first, on commitment to the aim of justice. Second, it depends on commitment

to professionalism. The declared beliefs of all professionals in the system—including advocates, counselors, and academic critics as well as judges—affect the quality of judging in the system. Third, the quality of judging depends on commitment to method. Judicial choice, at its best, is reasoned choice, candidly explained.

*Id.* at 5.

We members of the Bar, Bench, and Academies in the United States of America have long considered ourselves to be professionals in the highest and most honorable sense. I do not hesitate to say "we" in this context, since I have long been a member of the Bar, then Academies, and finally the Bench, at each step preserving my previous sense of belonging and adding another. We have had a tradition of mutual encouragement of professionalism that places the interests in doing justice above personal interests of all kinds. It is part of this tradition that one's seeing examples of professionalism in the performance of judges and advocates encourages one's own adherence to professional standards.

> Whether or not you are a judge or ever expect to be one, it makes a difference how well you understand judging in our legal system and what you believe about commitment to the aim of justice, to professionalism, and to method in judging.

*Id.* at 7 (footnote omitted).

Have changes occurred that make us less likely now to express our sense of professionalism and less likely to attribute any credit to our eighteenth-century predecessors? I believe so, and I believe the issues presented in the case before me illustrate a need for reflection about ways in which reexamination of the thoughtful eighteenth century debates may illumine problems we confront now.

The extent to which we, in the twenty-first century, are indebted to the Founders for the freedom and order we now experience is rarely expressed. Occasions do arise, however, when it becomes appropriate to take note of our debt to the Founders. Issues presented by the circumstances of submissions now pending before me in this case create an appropriate occasion to examine James Madison's contributions to federalist thought and action, and to consider their relevance to attitudes and actions of twenty-first century professionals in law.

## C. Conflicts of Interest

Conflicts of interest were very much on the minds of the Founders. To them, among the most troubling kinds of conflicts were those among public interests that would have to be harmonized or accommodated in some way to achieve their twin aims of liberty and order. An example is the conflict sometimes characterized as that "between passion and reason." In discussing the size of an assembly (or "house") of representatives, James Madison stated the point in this way:

> The truth is, that in all cases a certain number at least seems to be necessary to secure the benefits of free consultation and discussion, and to guard against too easy a combination for improper purposes: As on the one hand, the number ought at most to be kept within a certain limit, in order to avoid the confusion and intemperance of a multitude. In all very numerous assemblies, of whatever characters composed, passion never fails to wrest the sceptre from reason. Had every Athenian citizen been a Socrates, every Athenian assembly would still have been a mob.

*The Origins of the Three Branches of Government, supra,* at 41.

The Founders were also alert to the perils of conflicts of interest in the more usual sense of interests that may affect a professional's obligations to different persons among those who might be affected by his (or her, we must now add) performance as a professional representing interests of others. Conflicts of interest in this sense occupy a distinctive role in maintaining professionalism.

Interest is an ever-present threat. Especially is this so, I believe, in professionalism among persons educated in law.

One's commitment to professionalism in law is especially vulnerable to the influence of interest. If one can see the interest that one wishes to serve not as self-interest but as the interest of another, embracing this altruistic interpretation of circumstances may lead to discounting as an influence the fact that the other whose interest one is serving is a paying client whose future requests for representation have significant value.

Examples will help to clarify the point.

Liability insurance relationships have provided a history of conflicts of interest between the policyholder and the liability insurer when an injured third person makes a tort claim against the policyholder (as alleged tortfeasor) that in amount exceeds an applicable limit of liability insurance coverage under the policy. Even though the most professionally sensitive members of the Bar were alert to this problem from the beginning of recognition of liability insurance as a permissible form of coverage, the record of *reported* cases (probably only the tip of the iceberg) shows a history of slow recognition of this problem by insurers and attorneys they engaged to represent a policyholder sued as a tortfeasor. See generally Keeton, *Liability Insurance and Responsibility for Settlement,* 67 Harv.L.Rev. 1136 (1954); Keeton & Widiss, *Insurance Law* §§ 7.6,

7.8 (1988). Conflicts of interest arose on the plaintiffs' side as well as the defendant's side in tort claims arising from motor vehicle accidents involving injuries to two or more occupants of one of the vehicles, and property damage to both vehicles. Again, the record is one of slow recognition of the depth of the challenge to professionalism. *Id.,* §§ 7.5, 7.6.

Another set of examples of record has been presented by conflicts among minors and their parents (or other relatives seeking permission to represent the minors) in making claims against others for injuries sustained in circumstances giving rise to potential tort claims. Rules and practices of different jurisdictions and even of different courts within a jurisdiction have varied significantly.

Numerous additional examples of conflicts of interest in the course of representation of two or more persons or entities in civil proceedings in court are considered in the American Law Institute's Restatement of the Law Governing Lawyers. The latest available material on that ALI undertaking that is especially relevant to the issues in the present case is a document not yet adopted by the Institute but available as a submission to the Annual Meeting in 1998. It is also relevant to the issues before the court in this case because of the position proposed for the Black Letter of § 209:

§ 209. Representing Parties With Conflicting Interests in Civil Litigation

Unless all affected clients consent to the representation under the limitations and conditions provided in § 202, a lawyer in civil litigation may not:

(1) represent two or more clients in a matter if there is a substantial risk that the lawyer's representation of one of the clients would be materially and adversely affected by the lawyer's

duties to another client in the matter; or

(2) represent one client in asserting or defending a claim against another client currently represented by the lawyer, even if the matters are not related.

*Restatement (Third) of The Law Governing Lawyers* § 209 (Proposed Final Draft No. 2, 1998).

The ALI publication in the year 2000 of the first two volumes of Restatement of the Law Third, Restatement of the Law, the Law Governing Lawyers, covers only §§ 1—135 and thus does not reach § 209, quoted above in the draft proposed for consideration at the 1998 Annual Meeting.

These two published volumes do contain other sections potentially relevant to issues before this court in this case.

Two potentially relevant sections are the following:

§ 121. The Basic Prohibition of Conflicts of Interest

Unless all affected clients and other necessary persons consent to the representation under the limitations and conditions provided in § 122, a lawyer may not represent a client if the representation would involve a conflict of interest. A conflict of interest is involved if there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by the lawyer's own interests or by the lawyer's duties to another current client, a former client, or a third person.

§ 122. Client Consent to a Conflict of Interest

(1) A lawyer may represent a client notwithstanding a conflict of interest prohibited by § 121 if each affected client or former client gives informed consent to the lawyer's representa-tion. Informed consent requires that the client or former client have reasonably adequate information about the material risks of such representation to that client or former client.

(2) Notwithstanding the informed consent of each affected client or former client, a lawyer may not represent a client if:

(a) the representation is prohibited by law;

(b) one client will assert a claim against the other in the same litigation; or

(c) in the circumstances, it is not reasonably likely that the lawyer will be able to provide adequate representation to one or more of the clients.

*Restatement (Third) of The Law Governing Lawyers* §§ 121–122 (2000).

Also potentially relevant to issues before the court in this case are provisions in a section of Volume 1 of the Restatement of the Law Third on this subject under "Topic 5: Law–Firm Structure and Operation."

§ 9. Law–Practice Organizations—In General

(1) A lawyer may practice as a solo practitioner, as an employee of another lawyer or law firm, or as a member of a law firm constituted as a partnership, professional corporation, or similar entity.

(2) A lawyer employed by an entity described in Subsection (1) is subject to applicable law governing the creation, operation, management, and dissolution of the entity.

(3) Absent an agreement with the firm providing a more permissive rule, a lawyer leaving a law firm may solicit firm clients:

(a) prior to leaving the firm:

(i) only with respect to firm clients on whose matters the lawyer is actively and substantially working; and

(ii) only after the lawyer has adequately and timely informed the firm of the lawyer's intent to contact firm clients for that purpose; and

(b) after ceasing employment in the firm, to the same extent as any other nonfirm lawyer.

Comment:

. . . . .

b. *Forms of private law-practice organizations and the law regulating them.* A law firm established as a partnership is generally subject to partnership law with respect to questions concerning creation, operation, management, and dissolution of the firm. Originally in order to achieve certain tax savings, law firms were permitted in most states to constitute themselves as professional corporations. Most such laws permitted that form to be elected even by solo practitioners or by one or more lawyers who, through their professional corporation, became partners in a law partnership. Pursuant to amendments to the partnership law in many states in the early 1990s, associated lawyers may elect to constitute the organization as a limited-liability partnership, with significant limitations on the personal liability of firm partners for liability for acts for which they are not personally responsible (see Comment *c*). Correspondingly, some states permit lawyers to form limited-liability companies. Lawyers who are members of professional corporations or limited-liability companies are subject to statutory and court rules applicable to such organizations set up to practice law.

Among the questions determined by law generally applicable to the particular legal form in which the firm is constituted or attempted to be constituted are those specifying such matters as the following: the means by which the firm is to be constituted; who within the organization is authorized to govern the firm and to enter into contracts or otherwise incur liability on its behalf; the consequences of acts of any owner or nonowner employee causing injury to persons outside the organization (see § 58); the responsibility of the firm under laws governing employee rights; who within the firm is authorized to participate in managing the firm; what powers and rights exist in owners of the firm in the absence of controlling provisions in the firm agreement; the means by which an interest in the firm may be transferred and similar questions of succession to an interest in the firm; what events cause dissolution and what consequences follow from dissolution; and by what means the affairs of the firm are to be wound up on dissolution. With respect to any such issue, a provision of an applicable lawyer code bearing on the issue should control absent clear indication that valid different regulations governing structures of the kind involved are to control.

Both generally applicable law and lawyer-code provisions give lawyers considerable latitude in defining their relationship within the firm through their firm agreement. Documents establishing and regulating a law-firm partnership, professional corporation, or similar entity should be interpreted, to the extent reasonably possible, in a manner that would make them consistent with the duties provided in the lawyer code of the applicable jurisdiction. (Such a document is referred to herein as the "firm agreement.") Lawyer codes may in some instances require specific structural arrangements, as with the prohibition

against firm agreements restricting the freedom of clients to choose counsel (see Comment *i*). If rights or duties specified in a firm agreement or reasonably inferable from it are consistent with the applicable lawyer code, relationships among firm lawyers are controlled by the agreement, subject to controlling provisions of other law imposing rights and duties beyond those specified in the agreement. Absent a firm agreement validly redefining such duties, lawyers functioning in the same firm owe the firm and each other certain duties. Those duties are imposed by law and do not require a specification of the duty in a firm agreement. For example, lawyers within a firm bear toward each other and the firm a duty not to misappropriate law-firm funds or property. Thus, unless other specific provision is made by agreement, a lawyer could not arrange with a firm client to have a fee payment made directly to the lawyer rather than to the firm. Similarly, a lawyer could not make 'an unauthorized withdrawal of firm funds for personal use.

*Id.* § 9 and Comment b.

The court invites submissions of the parties regarding potential application to issues in this case of the quoted Black–Letter and Comments from the Restatement of the Law Third.

### ORDER

For the foregoing reasons, it is ORDERED:

(1) Defendant's Motion for Summary Judgment (Docket No. 24, filed November 6, 2000) is DENIED.

(2) A Case Management Conference to schedule further proceedings is set for 2:00 p.m., July 20, 2001. At this conference, the parties should be prepared to address questions about the appropriate course of action with respect to the unsettled question of state law, discussed in Part IV(B)(1), above.