**CHANGE THE CLIMATE, INC., Plaintiff**

v.

**MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, and Robert H. Prince, Jr., General Manager of the MBTA, in his official capacity, Defendants**

No. CIV. A. 00–10973–REK.

United States District Court, D. Massachusetts.

July 30, 2001.

44

Sarah Wunsch, Massachusetts Civil Liberties Union Fdn., Boston, MA, Harvey A. Schwartz, Kimberly H. Scheckner, Rodgers, Powers & Schwartz, Boston, MA, for plaintiff.

Julie E. Green, Brian S. Kaplan, Matthew S. Axelrod, Hill & Barlow, Boston, MA, for defendants.

Opinion and Order

KEETON, District Judge.

## I. Pending Matters

The matters pending for decision are associated with the following filings in this case:

(1) Defendants' Motion for Summary Judgment and Local Rule 56.1 Statement of Undisputed Facts (Docket No. 34, filed June 20, 2001) with Memorandum in Support (Docket No. 35, filed June 20, 2001), Witness Affidavits (1. Affidavit of Lucy V. Shorter; 2. Affidavit of Barbara Moulton; 3. Affidavit of Cornelia A. Kelley; 4. Affidavit of Marvin E. Goldberg, Ph.D.; 5. Affidavit of Herbert D. Kleber, M.D.) (Docket No. 36, filed June 20, 2001), and Affidavit of Julie E. Green, Esquire (Docket No. 37, filed June 20, 2001);

(2) Plaintiff Change the Climate, Inc.'s Motion for Summary Judgment (Docket No. 38, filed June 21, 2001) with Statement of Uncontested Facts (Docket No. 39, filed June 21, 2001), Memorandum of Law in Support (Docket No. 41, filed June 21, 2001), and Witness Affidavits (Docket No. 42, filed June 26, 2001).

(3) Plaintiff's Motion to Strike Portions of Defendants' Local Rule 56.1 Statement of Uncontested Facts and Supporting Affidavits (Docket No. 48, filed July 20, 2001);

(4) Memorandum of Law in Support of Plaintiff Change the Climate, Inc.'s Opposition to Defendants' Motion for Summary Judgment (Docket No. 49, filed July 20, 2001);

(5) Plaintiff Change the Climate, Inc.'s Response to Defendants' Statement of Uncontested Facts (Docket No. 50, filed July 20, 2001);

(6) Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (Docket No. 52, filed July 20, 2001);

(7) Defendants' Local Rule 56.1 Statement of Material Facts As to Which There Exists a Genuine Issue to Be Tried (Docket No. 53, filed July 20, 2001);

(8) Supplemental Affidavit of Julie E. Green, Esq. (with Exhibits A through I) (Docket No. 54, filed July 20, 2001); and

(9) Stipulation of Dismissal as to Defendant Lucy Shorter (Docket No. 55, filed July 20, 2001).

## II. Inappropriateness of Treating This Proceeding as a "Case Stated"

The opposing parties, rather than initially filing oppositions to each other's motions for summary judgment, promptly after the filing of those motions in June, 2001, simply filed clashing motions for summary judgment, each contending that no genuine dispute of material fact exists and that the court should decide this case as matters of law are decided. Even the numerous late July filings continue to argue the case as one in which all issues should be decided by the court as matters of law are decided. These circumstances suggest the possibility of treating this proceeding as a "case stated." *Equal Employment Opportunity Comm'n v. Steamship Clerks Union, Local 1066,* 48 F.3d 594, 603 (1st Cir.1995). *See generally* Keeton, *Judging in the American Legal System* § 17.2.4 (Lexis Law Publishing 1999).

The "case stated" procedure is most likely to be useful and appropriate when the only genuine dispute is truly one of law. The risk of misunderstanding and confusion from use of that procedure rises when genuine disputes exist also about "basic" facts (also commonly called "historical" facts concerning who did what, when, where, and in what circumstances). The risk rises more sharply when disputes exist also about evaluative inferences. When evaluative issues must be determined to decide the case, Supreme Court opinions regarding who is "better positioned" to decide evaluative issues become relevant. *See, e.g., Thompson v. Keohane,* 516 U.S. 99, 108–13, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (opinion of the Court, delivered by Justice Ginsburg), 516 U.S. at 117, 116 S.Ct. 457 (opinion of Justice Thomas, joined by the Chief Justice, dissenting)("Because the *Miranda* custody issue 'falls somewhere between a pristine legal standard and a simple historical fact,' we must decide 'as a matter of the sound administration of justice, [which] judicial actor is *better positioned* ... to decide the issue in question.'")(internal citations omitted)(emphasis added).

The hard choices judges make in their role as professional representatives of the community must be made with sensitivity to the limits of their authority. They are choices within the bounds of community standards, express or implied, that are defined in sources of legal authority available to a judge. The judge is not free to make the choice he or she would personally prefer, if it conflicts with these manifested community standards.

Keeton, *Judging in the American Legal System* at 6. *See also id.* at § 19.7.4 (citing also First Amendment precedents).

As explained in later parts of this Memorandum, the disputes existing in this case extend beyond disputes of law to disputes regarding basic facts and as well to disputes regarding evaluative inferences and determinations.

█ In these circumstances, I conclude that treating this proceeding as a "case stated" is inappropriate.

## III. Disputes Over Executive and Legislative Policy, Evaluative Inferences, and Determination of Evaluative Issues

### A. Introduction

The Memoranda and statements of purportedly undisputed facts that the parties have submitted in support of their respective positions on their cross-motions for summary judgment make relatively few proposals that are of a historical-fact nature. More numerous, and far more significant in the emphasis given to them, are their respective contentions over Executive and Legislative Policy (in contrast with proposed adjudicative determinations), evaluative inferences, and determination of evaluative issues.

Consider, first, their clashing contentions over what existing Executive and Legislative Policies are, and what they should be. Their clashing statements are alike in choosing the metaphor of a "war on drugs," but poles apart on how they choose to apply the metaphor.

Plaintiff opens its initial Memorandum of Law not with any assertion of law but with an "Introduction" that quotes Chief Judge

Torruella's journal article, *The "War on Drugs": One Judge's Attempt At A Rational Discussion.*

> Our nation has been engaged in a "war on drugs" since at least the mid–1970's. As with other wars, there is confusion over the purpose as well as disagreement over tactics. In war we tend, in the heat of battle, to lose sight of rationality and the continued need to search for the truth. So the time has come when we must step back from the trenches to determine where we are, what we have accomplished, and where we want to go.

14 Yale J. on Reg. 235, 235 (1997).

Plaintiff's initial Memorandum of Law proceeds with a discussion of the "political backdrop to this case," as if it were beyond question that this court not only should focus on the "political backdrop" in making its decision but should do so as the first priority in discharging its obligation of fair and impartial adjudication. Having read all the submissions before me in this case, I am yet to be persuaded that it is appropriate for me to consider issues that are political in a sense inconsistent with a judge's duty, acting in the distinctive role prescribed for judges in the American legal system, to do his or her best to make the decision on nonpolitical grounds that are fair and impartial and are candidly explained so public evaluation of the decisions of judges is both possible and encouraged. *See Judging in the American Legal System, supra,* at 1, 5, 6–7. *See also Dow v. Donovan,* 150 F.Supp.2d 249 (D.Mass.2001). Part VI of the opinion in that case addresses issues of professionalism of the American Bench and Bar that are also relevant to the present case. That part of that opinion explains a perspective about professionalism and about professional obligations that I conclude I must invoke in the performance of my professional role as trial judge in this case, as in that case.

## B. Madisonian Influences on Bench and Bar Roles in the American Legal System

Madisonian insights relevant to this case as well as *Dow* were described in the opinion in *Dow* in the following way:

The roles of twenty-first century legal professionals in the Bar, Bench, and Academies in the United States owe much to James Madison's seminal thinking expressed publicly and privately during debates over the structure of the new form of related state and national governments to be established under a constitution drafted in May 1787 to cure deficiencies in the Articles of Confederation (1777). *See generally* John P. Kaminski, Ph.D, Director, and Richard Leffler, Ph.D., Co–Director, The Center for the Study of the American Constitution, The University of Wisconsin–Madison, *The Origins of the Three Branches of Government,* Federal Judicial Center Traveling Seminar 3–9 (2001) (Wisconsin Study).

. . . .

Professionalism of persons educated in law, as it came to be recognized in the United States in the late nineteenth century and the early decades of the twentieth century, did not exist in the time of the Founders. Its development owed much to the Founders' ideas about the roles of impartial judges, and advocates who would appear before them. . . .

. . . .

Have changes occurred that make us less likely now to express our sense of professionalism and less likely to attribute any credit to our eighteenth-century predecessors? I believe so, and I believe the issues presented in the case before me illustrate a need for reflection about ways in which reexamination of the thoughtful eighteenth century debates may illumine problems we confront now.

The extent to which we, in the twenty-first century, are indebted to the Founders for the freedom and order we now experience is rarely expressed. Occasions do arise, however, when it becomes appropriate to take note of our debt to the Founders. Issues presented by the circumstances of submissions now pending before me in this case create an appropriate occasion to examine James Madison's contributions to federalist thought and action, and

to consider their relevance to attitudes and actions of twenty-first century professionals in law.

. . . .

*Dow v. Donovan,* 150 F.Supp.2d 249, 268–70 (D.Mass.2001).

## IV. Political Focus in the Present Case

Plaintiff in the present case continues the political focus of its initial submissions in another statement, beginning on the first page of its initial Memorandum of Law, asserting that the words quoted from Chief Judge Torruella's journal article "echo the message" of "the plaintiff in this case" and the message heard in "the cries of countless distinguished jurists, health care professionals, economists, scientists, governors, mayors, prosecutors, former secretaries of state, former U.S. Presidents, political commentators, journalists, police officers, and 'average Joes' like Joe White, the founder and Executive Director of plaintiff Change the Climate, who want to see the terms of the debate on our nation's drug policies change, who are frustrated by the hysteria that has so dominated the public domain over the past thirty years, and who have spoken provocatively in an attempt to foster rational, informed debate on the issues." Plaintiff's Memorandum of Law (Docket No. 41) at 1–2. In the footnote to this sentence, plaintiff adds:

> *See, e.g.,* Hon. James P. Gray, *Why Our Drug Laws Have Failed and What We Can Do About It: A Judicial Indictment of the War on Drugs,* 4 et seq. (Temple University Press 2001) (discussing public figures who have made "passionate plea for public debate on our failed drug policies," including numerous district and appellate court judges, Nobel laureate Milton Friedman, former secretary of state George Shultz, syndicated columnists William F. Buckley, Jr. and Arianna Huffington, broadcaster Walter Cronkite, Baltimore mayor Kurt Schmoke, former Kansas City and San Jose chief of police Joseph D. McNamara, New Mexico governor Gary Johnson, Harry Belafonte, honorary chair of the Citizen's Commission on U.S. Drug Policy, Carroll O' Connor, who lost a son to

addiction, and many, many others, noting "this is a nonpartisan issue that crosses all political boundaries.").

*Id.,* n. 2.

■ This theme recurs from time to time throughout plaintiff's initial Memorandum of Law, and as well in Plaintiff Change the Climate, Inc.'s Statement of Uncontested Facts (Docket No. 39). The 36 pages of text of this document, to which are attached supporting exhibits and affidavits of two inches in depth, is not in compliance, either in form or in content, with the requirements of Rule 56 of the Federal Rules of Civil Procedure and D.Mass. LR 56.1 for a statement of facts. This statement is argumentative rather than factual. It is difficult for a reader to ferret out any statements of allegedly indisputable historical facts, or even evaluative assertions that one could credibly claim to be incontestable.

Not to be entirely outdone in the degree of departure from the requirements that a statement of undisputed facts must satisfy to be in compliance with Rule 56 and Local Rule 56.1, defendants filed on June 20, 2001, as part of Docket No. 34, a 16–page "statement of material undisputed facts" declared to be relevant to the Defendants' Motion for Summary Judgment. I cannot conclude that plaintiff's later submissions constitute an effective challenge to the strictly factual elements of the first six of these statements as appropriate assertions of historical fact. They are included among the quotations below to enable a reader to understand the non-factual assertions that follow in these excerpts from defendants' assertions of "material undisputed facts" in Docket No. 34. The numbers used are those the statements were given in Docket No. 34.

1. Plaintiff Change the Climate, Inc., is a non-profit corporation. Its president is Joe White of Greenfield, Mass., .... (Amended Complaint, ¶¶ 1, 6.)

2. At the heart of this case are three advertisements created on a home computer by White. All three advertisements have a large picture, minimal text, and nothing to identify the nature of the organization sponsoring them other than a Web site: "www.changetheclimate.org." (Copies

are appended to the memorandum in support of this motion.)

3. The first advertisement (the "Teen Ad") features a photograph of a teen-aged girl wearing a baseball cap worn fashionably backwards. The text says, "Smoking pot is not cool, but we're not stupid, ya know. Marijuana is *NOT* cocaine or heroine. Tell us the truth...."

4. The second advertisement (the "Mother Ad") depicts an adult woman—apparently both a mother and a teacher—writing on a chalkboard. The text says, "I've got three great kids. I love them more than anything. I don't want them to smoke pot. But I know jail is a lot more dangerous than smoking pot."

5. The third advertisement (the "Police Ad") depicts two police officers standing in front of an oversized American flag. The caption reads, "Police are too important ... too valuable ... too good ... to waste on arresting people for marijuana when *real* criminals are on the loose."

6. White conceived of and designed these Ads by himself. He wrote the text, created the layout, and downloaded the photographs from the Internet. At his deposition, he described the process of creating the Ads as follows:

> I had a bunch of scrambled thoughts, and I would write them into my computer and change the words and, you know, press the delete key. And then I tried to create pictures in my mind about what the advertisements would look like.

(White Depo. at 44.)

7. It is undisputed that White, a telemarketing consultant, has no experience or training in media or advertising. (White Depo. at 7–17, 20–21, 78.) He has never worked with an advertising consultant or advertising professional of any type, nor with a media consultant or media professional. (White Dep. at 43–44, 71–73.) He created the Ads alone; other than White, "nobody had anything to do with the ads." (White Depo. at 21–22, 43–44, 71–73.)

. . .

15. The MBTA administers and sells its advertising space through an independent contractor that serves as the T's advertising agent. From 1993 through June 2000, that agent was Park Transit Displays, Inc. ("Park Transit"). As of January 2000, when Park transit was operating under an extension to its original contract with the MBTA, the T's guidelines for advertising acceptability were contained in the "Appearance and Character of Advertisements" section (the "Appearance and Character Guidelines" or the "Guidelines") of its "Specifications for Transit Advertising" dated October 15, 1999 (the "1999 Bid Specs"), which formed part of the bid specifications for the renewal contract. (Shorter Depo. at 21, 23–24, 26; Shorter Aff. ¶ 6.)

. . .

19. The MBTA's Appearance and Character Guidelines provide that the MBTA will not display advertisements that contain firearms or tobacco products. It will not allow ads containing profanity, "libelous, slanderous, or obscene" matter, "violent" or "criminal" content, or "advertisements that denigrate groups based on gender, religion, race, ethnic or political affiliation." The Guidelines also warn that the MBTA—the primary school transportation for thousands of school children each day—will not display advertisements for materials that promote activities "harmful to juveniles." (Moulton Aff. at ¶ 11 and Exh. B (1999 Bid Specs, Article VII).) (A copy of the Guidelines is attached to the Moulton Affidavit at Exh. B.)

20. Former General Manager Robert Mabardy's 1995 letter to Park Transit supplements the Guidelines, and specifically focuses on advertising's effect on children by making clear that the MBTA will not display material that is indecent as to child viewers or frightening to children in a manner that causes them to suffer physical or emotional distress. (Moulton Aff. ¶ 15 and Exh. C.)

21. Advertising helps create and shape peoples' perceptions. (Affidavit of Marvin E. Goldberg, Ph.D. ("Goldberg Aff.") ¶ 5.) (Joe White agrees that advertising is "powerful." (White Depo. at 163).) Juveniles (persons between the ages of 9 and

18) are particularly susceptible to the effects and influence of advertising. (Goldberg Aff. ¶ 14.) Susceptibility to peer influence peaks in middle adolescence, when juveniles typically search for cues from their peers and advertising for the right way to behave. (Goldberg Aff. ¶ 14.)

. . .

24. Park Transit sent advertising copy to the MBTA for review only when Park Transit was concerned that the advertisement did not comply with the Appearance and Character Guidelines. (Albertelli Depo. at 12, 14; Shorter Aff. ¶ 10.) In such cases, Park Transit forwarded the advertisement to Lucy Shorter, the MBTA's Director of Marketing Communications, together with a full-size color copy of the proposed advertisements and information indicating the number of posters to be displayed, the date the campaign was to begin, the duration of the campaign, and the total volume of the campaign. (Albertelli Depo. 61–62; Shorter Depo. at 14, 37; Shorter Aff. ¶ 11.)

25. From approximately 1994 or 1995 until her retirement in November 2000 (Shorter Depo. at 8), Shorter acted as Park Transit's liaison with the MBTA. Although she was not herself responsible for approving or disapproving proposed advertisements (Shorter Depo. at 11), Shorter circulated application packages to the MBTA's general manager and others for a determination as to whether the ads complied with the Appearance and Character Guidelines and could be accepted. (Shorter Aff. ¶ 11–12.)

26. Since July 1997, the ultimate decision-maker on questionable advertisements has been the MBTA's General Manager, Robert H. Prince, Jr. (Deposition of Robert H. Prince, Jr. ("Prince Depo.") at 4–5; Shorter Aff. ¶ 12.)

27. Robert Prince never saw Joe White's Ads until well after this lawsuit was commenced. (Prince Depo. at 26.) That is because Change the Climate never made a formal advertising application to the MBTA. (Shorter Aff. ¶¶ 16, 20.)

28. White did have several preliminary conversations with Park Transit's Albertelli about his proposed advertising campaign, which he twice described to her as "provocative." (White Depo. at 67, 85.) He first met Albertelli in person in May, 1999, when he asked her about the process for placing ads on the T. (White Depo. at 84–85.) He submitted the three proposed Ads to her around January 4, 2000. (White Depo. at 123–124.) When Albertelli reviewed the ads, she questioned whether they complied with the MBTA's Appearance and Character Guidelines. (Albertelli Depo. at 26, 42.) She therefore sent them to Lucy Shorter for her informal review and comment. (Shorter Depo. at 35–36, 39, 41; Albertelli Dep. at 23.)

29. What Ms. Shorter received from Park Transit and Joe White was not a formal advertising application. (Shorter Depo. at 35; Albertelli Depo. at 62.) It included black-and-white miniature copies of the Advertisements (not color, full-sized ones), and it did not indicate the date the campaign was to begin, the duration of the campaign, or the total value of the campaign. (Albertelli Depo. at 62.)

30. It is undisputed that unprescribed marijuana use is unlawful, and therefore harmful to juveniles. Mass. Gen. Laws ch. 94C §§ 31 and 34. At his deposition, Joe White admitted that marijuana is unhealthy and harmful to juveniles. "As a parent, I just wouldn't want my kid smoking marijuana … [b]ecause I would want them focusing on healthy activities—academics, school, sports—and not doing things that may be unhealthy for them." (White Depo. at 40–41.) White testified that "it's a fact that marijuana is illegal. You can go to jail. There are other potential harms that might come to kids or other people who smoke pot." (White Depo. at 152.) He further testified, "Change the Climate's position is that smoking pot is not appropriate for kids, and that says it all. We, Change the Climate, would not have and would not propose an advertisement that said smoking pot is okay in any fashion." (White Depo. at 155–156.)

31. It was evident to Lucy Shorter that the Advertisements, which appeared to be directed at juveniles, promoted marijuana use. In her view, they violated the Appearance and Character Guidelines' prohibition of advertising that is harmful to juveniles and that encourages criminal conduct. (Shorter Depo. at 36–37, 39, 41–43, 52, 71–72, 77–78.) She also believed that by promoting drug use, the Advertisements appeared to conflict with the MBTA's Drug–Free Workplace policy. (Shorter Depo. at 71–72.)

32. Shorter's view is one that is shared by others. The principal of Boston Latin High School (thousands of whose students take the T to school each day) believes that the Ads encourage the use of marijuana. She states in her affidavit that she would not display the Ads on Boston Latin school property, and would not want the Ads displayed on the MBTA transit system that carries Latin students to school. (*See* Kelley Aff. ¶ 6.)

33. Newspaper headline and editorial writers describing this lawsuit have referred to the Ads as "pro-pot." Attached to the Green Affidavit at Exhs. F through I are certified copies of articles headlined, "Gov sticks by pot ad fight," "MBTA sued for nixing pro-marijuana ads," and "Cellucci urges MBTA to fight suit over pro-marijuana ads." An editorial refers to the ads as "pro-pot advertising."

34. In addition, the MBTA has submitted with this motion the expert testimony of Pennsylvania State University Prof. Marvin E. Goldberg, Ph.D., who has extensive experience, training and research in the fields of advertising and marketing. According to Prof. Goldberg, the Ads send juveniles the messages that "using marijuana is okay" or "it is not a big deal." (Affidavit of Marvin E. Goldberg, Ph.D. ("Goldberg Aff.") ¶ 4.) Specifically, juveniles are likely to take from the Teen Ad the messages that attractive and "cool" peers and role models have used marijuana, "many other juveniles are thinking about using marijuana," only "stupid" people would take seriously the fact that the drug is illegal, and "marijuana isn't so bad." (Goldberg Aff. ¶¶ 17–21.) Juveniles

are likely to take from the Police Ad the message that marijuana users are not real criminals, that using marijuana won't get you in trouble, and that police will not enforce anti-marijuana laws. (Goldberg Aff. ¶¶ 18 and 22.) Juveniles are likely to take from the Mother Ad the messages that "many juveniles use marijuana," "using marijuana is hardly dangerous at all," even mothers are resigned to the prospect of their children smoking marijuana and parents do not seriously oppose its use. (Goldberg Aff. ¶¶ 19 and 23.)

35. Similarly, Herbert D. Kleber, M.D., a professor of psychiatry and the director of the Division on Substance Abuse at the College of Physicians and Surgeons of Columbia University and the New York State Psychiatric Institute, has offered expert testimony that the Ads promote marijuana use among juveniles. (Affidavit of Herbert D. Kleber, M.D. ("Kleber Aff.") ¶ 4.) Specifically, the Police Ad suggests that using marijuana is not a "real" crime, and implies that using marijuana will not result in criminal penalties, thus lessening perceived risk and subtly promoting marijuana use. (Kleber Aff. ¶ 8.) The Teen Ad subtly promotes marijuana use by suggesting that juveniles are knowledgeable about and comfortable with marijuana use. (Kleber Aff. ¶ 5.) The Mother Ad subtly promotes marijuana use by sending the message to juveniles that many of their peers are using marijuana, and that even mothers are resigned to the prospect of their children smoking marijuana. (Kleber Aff. ¶ 6.)

36. Adolescence is a critical age for making decisions about marijuana use. Juveniles are particularly susceptible to messages promoting marijuana use because juveniles, more than other age groups, are searching for cues regarding marijuana use. (Kleber Aff. ¶ 2.) As compared to other age groups, juveniles are particularly at risk for initiation of marijuana use. (Kleber Aff. ¶ 2.) Research shows that the risk that a person will begin using marijuana rises throughout that person's adolescence up until age 18. After age 18, the risk that a person will start using marijuana steadily declines. If a

person does not begin using marijuana by the time he or she has turned 21, it is unlikely that person will do so. (Kleber Aff. ¶ 2.)

37. Marijuana usage by one's peers and, even more so, the *perception* of marijuana use by peers, are strong predictors of initiation of marijuana use. (Goldberg Aff. ¶ 15.) Research shows that the perception of marijuana use by one's peers is a strong predictor of whether one will begin using marijuana. Juveniles who have the perception—accurately or inaccurately—that their peers use marijuana are more likely to do so themselves. (Kleber Aff. ¶ 3.) The perceived level of risk associated with using marijuana is also a lead indicator predictive of actual level of use among high school students. (Goldberg Aff. ¶ 16.) Juveniles are sensitive to messages about the harms associated with marijuana use. Trend analyses of drug use beliefs and behaviors over the past two decades indicate that increases in drug use rates are associated with a decline in the perception that drugs are harmful, and vice versa. (Kleber Aff. ¶ 7.)

38. Prof. Goldberg testified in his affidavit that the Teen Ad conveys the messages that "many other juveniles are actively deliberating the merits of marijuana" and that "marijuana isn't so bad." (Goldberg Aff. ¶ 17.) For several reasons, it is particularly likely to command the attention of adolescents and to be persuasive to adolescents. Portraying an adolescent wearing a baseball cap worn backwards is a highly effective way of quickly telegraphing a message to other adolescents, and generates a sense of similarity between the spokesperson and the audience, which is a very powerful device in gaining the attention of, and persuading, a target audience. (Goldberg Aff. ¶ 17(a).) The easily recognizable colloquial language used by the adolescent spokesperson, which mimics adolescent speech ("we're not stupid, ya know"), is also likely to attract the attention of adolescents. (Goldberg Aff. ¶ 17(b).)

39. According to Prof. Goldberg, the phrase, "We're not stupid, ya know," invokes the power of the peer group, sug-

gesting there is a broad set of the teen spokesperson's cohort that is knowledgeable about marijuana usage and/or agree with and support the advertisement's message. (Goldberg Aff. ¶ 17(c).) The underlined and capitalized word "*NOT*" in the second line of text makes the second line of text more likely to be noticed and remembered than the first line, which contains the cautionary statement that "marijuana is not cool." (Goldberg Aff. ¶ 17(d).) Words in larger print, and sentences that are shorter, will be noticed more quickly and are more likely to be remembered. (Goldberg Aff. ¶ 17(d).) Finally, juveniles are likely to process this ad using a simplifying heuristic that there is one positive and one negative statement regarding marijuana, and conclude that, on balance, "marijuana isn't so bad." (Goldberg Aff. ¶ 17(e).)

40. Prof. Goldberg testifies in his affidavit that the structure of the Mother Ad is effective in communicating the messages that "many juveniles use marijuana," and "using marijuana is not that dangerous." (Goldberg Aff. ¶ 19.) The figure is identified in the text of the advertisement as a mother, and also appears at a glance to be a teacher standing at a chalkboard. (Goldberg Aff. ¶ 19(a).) The mother's statement in the advertisement, "I don't want them to smoke pot. But ..." conveys a message to juveniles that even mothers are resigned to the fact that their children will smoke marijuana. (Goldberg Aff. ¶ 19(a).) This conveys the impression to juveniles that many of their peers are using marijuana, and that use of marijuana is not particularly serious. (Goldberg Aff. ¶ 19(a).) Juveniles are adept at picking up verbal or non-verbal qualifiers. (Goldberg Aff. ¶ 19(b).) The final statement is just such a qualifier, suggesting that marijuana use, though perhaps not desirable, is more or less inevitable. (Goldberg Aff. ¶ 19(b).)

41. According to Prof. Goldberg, the statement in the advertisement that "jail is a lot more dangerous than smoking pot" is not likely to be fully understood by juveniles, particularly juveniles who process it only partially. (Goldberg Aff. ¶ 19(c).)

The likely take-away from this advertisement is not that smoking "pot"—the vernacular term that is more accessible to juveniles than "marijuana"—is less dangerous than jail, but the simpler message that smoking pot is hardly dangerous at all. (Goldberg Aff. ¶ 19(c).) That message is at odds with the elemental truth that smoking marijuana is against the law, and carries the danger of arrest, fines, incarceration, and other ill effects. (Goldberg Aff. ¶ 19(c).)

42. Prof. Goldberg also states in his affidavit that the structure of the Police Ad is particularly effective in encouraging the reader to draw the inference that marijuana users are not real criminals and thus would not be sought after by police. (Goldberg Aff. ¶ 18.) Using the eye-catching background of an oversized American flag, this advertisement will be understood by many juveniles to be endorsed by the police (including perhaps the MBTA police). (Goldberg Aff. ¶ 18(a).) It draws upon two powerful symbols of authority, police officers and the American flag. (Goldberg Aff. ¶ 18(a).) This advertisement downplays the penalties associated with marijuana by suggesting that police do not consider marijuana to be a "real" crime and that police consider prosecution of offenders on marijuana charges to be a "waste" of "valuable" police resources. (Goldberg Aff. ¶ 18(b).) It thereby encourages juveniles to engage in behaviors that will cause them harm—to wit, arrest, fines, criminal record, and/or incarceration, among other harms. (Goldberg Aff. ¶ 18(b).)

43. On or about January 20, 2000, Ms. Shorter communicated her assessment of the Ads to Park Transit's Albertelli in a hastily written fax, to which she attached a copy of the Appearance and Character Guidelines and the Drug–Free Workplace policy. The Change the Climate ad campaign, she wrote, "promotes the use of marijuana in a subtle way." (Shorter Depo. at 38–40, 42, 44.)

44. Shorter did not circulate the Advertisements to higher-ups at the MBTA because she did not understand them to have been formally submitted to her for display on MBTA facilities. (Shorter Aff. ¶ 16.) General Manager Prince played no role in Shorter's review of the Advertisements or her response to Albertelli. (Prince Depo. at 52.)

45. Shorter testified at deposition that when she scrawled her assessment of the Ads in the fax to Albertelli, she was simply "trying to move the document off [her] desk." (Shorter Depo. at 40.) At deposition, she also clarified that when she wrote that "their mission" violated T policies, she was referring to the mission *of the Advertisements*—promoting the unlawful use of marijuana—not the mission of Change the Climate. (Shorter Depo. at 59–62.)

46. Both Albertelli and Shorter testified unequivocally that Shorter's fax did not formally reject the Advertisements (Shorter Depo. at 56; Albertelli Depo at 30–31), and plaintiff can offer no evidence to the contrary. The fax from Shorter to Albertelli was not in the form in which Park Transit typically received a formal rejection of an advertising submission; it was not "by any means a final reply or decision about Change the Climate's advertising executions." (Albertelli Depo. at 57, 59.) Shorter testified at deposition that when she sent her note, she expected that Albertelli would advise Joe White to design an ad that conformed to the MBTA Appearance and Character Guidelines, and that the Advertisements would be resubmitted, at which point Ms. Shorter would circulate them for a formal decision. (Shorter Depo. at 38–40, 42, 44.) Such a give-and-take process had occurred on other occasions, and typically resulted in a dialogue between Park Transit and the MBTA, resulting in the creation of ads that fall within the Guidelines (Albertelli Depo. at 37.)

47. This was Ms. Albertelli's understanding as well; she thought Change the Climate would revise the Advertisements and submit new versions, "like any other client would have." (Albertelli Depo. at 31.)

48. But Joe White responded differently. He did not ask for clarification from Park Transit or the MBTA. He did not

submit a formal application. He did not insist that the MBTA formally consider his submission. Instead, Joe White's entity, Change the Climate, filed this federal lawsuit. (Shorter Aff. ¶ 21.)

49. In the Amended Complaint, plaintiff has waived any claim for damages, but asks this Court for a mandatory affirmative injunction, ordering the MBTA to display the plaintiff's Ads on MBTA facilities—notwithstanding the MBTA's belief that the Ads violate its Appearance and Character Guidelines.

Docket No. 34 at numbers 1–7, 15, 19, 20, 21, 24–49 (footnotes omitted).

## V. Reasons for Denying the Cross–Motions for Summary Judgment

Neither of the two pending motions for summary judgment has been filed in full compliance with Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1. The requirements for a properly submitted motion are very explicitly stated in the Local Rule.

Motions for summary judgment shall include a concise statement of the *material facts* of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation. Failure to include such a statement constitutes grounds for denial of the motion. Opposition to motions for summary judgment shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation. Copies of all referenced documentation shall be filed as exhibits to the motion or opposition. Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties.

D. Mass. LR 56.1 (emphasis added).

"Facts" means historical facts, not mixed-law fact assertions and not evaluative determinations. A statement of undisputed facts is not in compliance with the requirements of Federal Rule 56 and Local Rule 56.1 if it fails to separate the assertions of undisputed historical facts from mixed law-fact assertions and evaluative assertions. None of the clashing purported statements of undisputed facts submitted by plaintiff and defendants complies with this requirement.

Applying the Federal and Local Rules, this court should grant summary judgment only if, viewing the evidence in the light most favorable to the nonmovant, the court determines that no genuine dispute of material fact exists and that the movant is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record showing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant satisfies this burden, then the nonmovant must "demonstrate, through specific facts, that a trialworthy issue remains." *Cadle Co. v. Hayes,* 116 F.3d 957, 960 (1st Cir.1997).

Issues of fact are in "genuine" dispute if they "may reasonably be resolved in favor of either party." *Id.* Facts are "material" if they possess "the capacity to sway the outcome of the litigation under the applicable law." *Id.* The facts in genuine dispute must be significantly probative in order for the court to deny summary judgment; "conclusory allegations, improbable inferences, and unsupported speculation will not suffice." *Id.*

Rather than delaying a ruling on the cross-motions for summary judgment now before the court, I conclude that the more appropriate course is to deny both motions and order that the parties proceed to prepare this case for a probable trial. Such a ruling would be explicitly not a ruling on the merits, and of course it would not bar a party from filing an appropriately supported motion for summary judgment at any appropriate time in the course of preparation for trial. At present, however, it appears likely that any attempt

to conclude this case with a dispositive motion before trial is likely to be unsuccessful because of the existence of material and reasonably disputable mixed-law-fact-evaluative issues.

## VI. Precise Identification of Genuinely Disputable Factual and Evaluative Issues That Must Be Resolved to Decide This Case

If the court determines that any aspect of this case is to be submitted to a jury, the court will require the jury to return a verdict only in the form of answers to special questions under Rule 49(a) of the Federal Rules of Civil Procedure. Plaintiff must submit, before commencement of trial, a clear and precise identification of the legal and factual elements of any claim it wishes to assert should the court order that this case go to a jury. The submission filed by plaintiff to meet this requirement must be precise in its formulation of historical factual questions, and evaluative questions. It must include a precise formulation (appropriate for use in a verdict form for submission of the case to the jury on special questions only under Rule 49(a) of the Federal Rules of Civil Procedure) of every historical fact question and every evaluative question that plaintiff contends is supported by admissible evidence and thus, is trialworthy.

Similarly, each defendant must submit, before commencement of trial, a clear and precise identification of the legal and factual elements of any defense it wishes to assert should the court order that this case go to a jury.

Even if no aspect of the case is submitted to a jury, precise identification of issues the court must decide will be necessary to orderly proceedings toward disposition.

A possible structure for drafting proposals for more nearly precise identification of issues to be considered before decision of the outcome in this case (either in a jury trial or in a nonjury trial) appears immediately below. The parties are invited to use this structure in any submissions they wish to file for consideration at the next Case Management Conference. Each party may instead use some other structure that party proposes.

1(a)(1). Did Robert Prince determine, on or before May 1 [or some other day in May], 1999, that he would delegate to Park Transit or to Lucy Shorter, the function of examining proposals for use of advertising space on MBTA vehicles and approving proposals determined to be acceptable under criteria established by Prince on or before the date stated above?

_____ YES _____ NO

If YES, delegate to whom?

(A) Park Transit _____ YES _____ NO

(B) Lucy Shorter _____ YES _____ NO

If YES to 1(a)(1), go to 1(a)(2). Otherwise, go to Question 2.

1(a)(2). In so doing, was Robert Prince acting within the scope of his authority as an official of MBTA? To state your finding, check in the blank beside (A) only, or beside (B) only, or beside (C) only.

(A)_____ YES, because the Board had explicitly authorized

(i) As to Park Transit _____ YES _____ NO
(ii) As to Lucy Shorter _____ YES _____ NO

(B)_____ YES, because the general authority conferred on Prince by the Board included this authority

(i) As to Park Transit _____ YES _____ NO
(ii) As to Lucy Shorter _____ YES _____ NO

(C)____ NO

**If YES to 1(a)(2), go to 1(a)(3).**

1(a)(3).   Did the criteria established by Prince violate any legally protected right of plaintiff?   Check in only one blank to state your finding.

(A)____ YES, they violated plaintiff's right to a hearing before the MBTA Board or its authorized representative

(B)____ YES, they violated plaintiff's right to freedom of expression on issues of public concern by placing content-based limitations on what could appear in space on MBTA vehicles that, under the established criteria, had become a forum for public use

(C)____ NO

**If YES to 1(a)(3)(A), go to 1(a)(4)(A).**

1(a)(4)(A).   Which of the following factors had significant weight in your answering YES to 1(a)(3)(A)?
        (i)     The lack of clear instructions to plaintiff about what request had to be made to whom in order to receive a hearing

____ YES   ____ NO

If YES, how much weight did this factor have?

____ Slight

____ Moderate

____ Heavy

        (ii)    The refusal to provide a hearing unless plaintiff agreed to waive legally protected rights

____ YES   ____ NO

If YES, how much weight did this factor have?

____ Slight

____ Moderate

____ Heavy

        (iii)   [Another factor a party wishes to propose]

**If YES to 1(a)(3)(B), go to 1(a)(4)(B).**

1(a)(4)(B).   Which of the following factors had significant weight in your answering YES to 1(a)(3)(B)?
        (i)     The lack of clear instructions to plaintiff about what changes, if any, plaintiff would have to make in its proposal before its proposed message could appear in the space on MBTA vehicles that had become a forum for public use

____ YES   ____ NO

If YES, how much weight did this factor have?

_____ Slight

_____ Moderate

_____ Heavy

(ii)    The restriction against a message proposing that the law be changed to authorize use of marijuana

· _____ YES   _____ NO

If YES, how much weight did this factor have?

_____ Slight

_____ Moderate

_____ Heavy

(iii)   The restriction against a message about marijuana use being displayed at hours when child-passengers on an MBTA vehicle would be likely to see them

If YES, how much weight did this factor have?

_____ Slight

_____ Moderate

_____ Heavy

(iv)   [Another factor a party wishes to propose]

2(a)(1) Has plaintiff at any time submitted to MBTA or to the court a proposal for the content of a message to be displayed in the space reserved for advertising on MBTA vehicles used for public transportation that is specific enough to enable the court (or a jury if the court determines that jury trial is appropriate) to decide the subquestions identified in some or all of the subparts to this question?

_____ YES   _____ NO

**If NO to 2(a)(1), skip to Question 3. Otherwise, go to 2(a)(2).**

2(a)(2) Is the proposed content such that it could not be reasonably interpreted by one or more identifiable groups of readers using an MBTA vehicle for public transportation not only as a statement of position on political issues by plaintiff, Change the Climate, Inc., but also as a statement by MBTA of its position regarding the extent in fact of use of marijuana by children and acquiescence in, or support for, allowing that use to continue without enforcement by public officials of laws prohibiting that use?

_____ YES   _____ NO

**If NO to 2(a)(2), skip to Question 3. Otherwise, go to 2(a)(3).**

2(a)(3) Is it reasonable for the court to decline to grant plaintiff a remedy that in its nature is a mandatory injunction to the MBTA to publish a message that the MBTA considers to be a misrepresentation of its position on political issues of public concern?

_____ YES   _____ NO

[With further subquestions on the subject of Question 2 analogous to the various subquestions of Question 1.]

## VII. Other Precedents To Be Considered

In thinking about the mixed-law-fact-evaluative issues identified in Part VI, above, and as well any other questions this court must consider before final disposition of this case, without doubt it will be appropriate to take into account, in addition to authorities cited in the memoranda of the parties thus far filed, at least, two recent decisions:

> *Lorillard Tobacco Co. v. Reilly,* —— U.S. ——, 121 S.Ct. 2404, —— L.Ed.2d —— (June 28, 2001); *Good News Club v. Milford Central School,* —— U.S. ——, 121 S.Ct. 2093, 150 L.Ed.2d 151 (June 11, 2001);

Neither of these cases is directly on point, but the numerous opinions in both say many things that have a material bearing upon the issues identified in Part VI, above, and may suggest other issues beyond those identified in Part VI.

## VIII. Other Matters

Plaintiff's Motion to Strike Portions of Defendants' Local Rule 56.1 Statement of Uncontested Facts and Supporting Affidavits (Docket No. 48) proposes that the court apply a standard to defendants' submission that, if applied evenhandedly to plaintiff's own submissions, would lead the court to strike major portions of numerous submissions before the court. The more sensible ruling, since in any event I am denying defendants' motion for summary judgment as well as plaintiff's motion for summary judgment, is to deny the motion to strike and allow all submissions to remain a part of the formal record in this court and in a higher court in which appeal or review is sought at any time in the future.

## ORDER

For the foregoing reasons, it is OR-DERED:

(1) Defendants' Motion for Summary Judgment (Docket No. 34) is DENIED.

(2) Plaintiff Change the Climate, Inc.'s Motion for Summary Judgment (Docket No. 38) is DENIED.

(3) Plaintiff's Motion to Strike Portions of Defendants' Local Rule 56.1 Statement of Uncontested Facts and Supporting Affidavits (Docket No. 48) is DENIED.

(4) Stipulation of Dismissal as to Defendant Lucy Shorter (Docket No. 55) is noted and accepted by the court, and all claims against her are DISMISSED WITH PREJUDICE.

(5) The court invites the parties to file submissions, not less than two weeks before the next Case Management Conference, identifying their respective contentions regarding all genuinely disputable factual and evaluative issues that must be resolved to decide the outcome of this case.

(6) The next Case Management Conference is scheduled for 3:00 p.m. on September 18, 2001.